UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re Application of

OTKRITIE INTERNATIONAL
INVESTMENT MANAGEMENT LIMITED,
a company incorporated in the British Virgin
Islands,

OTKRITIE SECURITIES LIMITED,
a company incorporated in England and Wales,
and

OTKRITIE FINANCIAL CORPORATION JSC,
a company incorporated in the Russian Federation,

To Issue Subpoenas for the Production of
Documents and Testimony for Use in a Foreign
Proceeding.



13 MISC 0202

## DECLARATION OF MICHAEL C. MILLER IN SUPPORT OF EIGHTH APPLICATION FOR AN ORDER UNDER 28 U.S.C. § 1782 TO ISSUE SUBPOENAS FOR THE PRODUCTION OF DOCUMENTS AND TESTIMONY FOR USE IN A FOREIGN PROCEEDING

I, Michael C. Miller, hereby declare as follows:

1. I am an attorney admitted to practice before this Court and a member of the firm Steptoe & Johnson LLP, counsel to Otkritie International Investment Management Limited ("Otkritie Management"), Otkritie Securities Limited ("OSL"), and Otkritie Financial Corporation JSC ("Otkritie Financial," and collectively, "the Otkritie Entities" or "Applicants") in the above-captioned proceeding.

2. I make this Declaration in support of the accompanying eighth application ("Eighth Application") for an Order under 28 U.S.C. § 1782 ("Section 1782"), directing RBS Securities Inc. (hereinafter, "RBS US" or "Respondent") to produce documents and testimony responsive to the subpoenas annexed hereto as "Exhibits 1 and 2."

1

3. This Application follows seven previously-granted applications for judicial assistance, filed on January 4, February 21, April 13, May 24, August 6, November 13, and November 19, 2012, respectively. *See In re Application of Otkritie Int'l Invest. Mgmt. Ltd. et al. to Issue Subpoenas for the Production of Documents for Use in a Foreign Proceeding* ("In re Application of Otkritie"), at DE 9, 13, No. 12-MC-1 (S.D.N.Y. 2012); *In re Application of Otkritie*, at DE 8, No. 12-MC-118 (S.D.N.Y. 2012); *In re Application of Otkritie*, at DE 1, No. 12-MC-177 (S.D.N.Y. 2012); *In re Application of Otkritie,* at DE 8, No. 12-MC-262 (S.D.N.Y 2012); *In re Application of Otkritie,* at DE 5, No. 12-MC-374 (S.D.N.Y 2012); *In re Application of Otkritie*, at DE 13, No. 12-MC-382 (S.D.N.Y. 2012).

4. Applicants are plaintiffs in a civil fraud action pending in the High Court of Justice, Queen's Bench Division, in the United Kingdom, captioned *Otkritie International Investment Management Ltd. et al. v. Urumov et al.*, 2011 Folio 1182 (hereinafter, "the U.K. Action"). *See, e.g., In re Application of Otkritie*, 12-MC-1, at DE 1 ¶¶ 1, 10-11.

5. The primary goal of the First, Second, Third, Fourth, and Sixth applications was to trace the dissipation of misappropriated funds in support of the U.K. Action and Applicants' worldwide asset freezing efforts. To that end, Applicants sought primarily transactional records from banks located in the District and suspected to have unwittingly facilitated a fraud on Applicants orchestrated by Applicants' former employees Georgy Urumov ("Urumov"), Ruslan Pinaev ("Pinaev"), Sergey Kondratyuk ("Kondratyuk"), and Yevgueni Jemai ("Jemai"), and their accomplices (collectively, "the Co-Conspirators").

6. The Fifth Application sought from Newedge USA ("Newedge"), a brokerage headquartered in the Southern District, documents and testimony concerning a failed securities transaction, that, if consummated, may have enabled the Co-Conspirators to conceal their fraudulent scheme.

7. The Seventh Application had a slightly different focus than the previous six. Targeting a U.S. broker-dealer known to have been involved in accumulating the Argentinean GDP-linked securities used to defraud Applicants (hereinafter, "the Warrants"), the Seventh Application aimed to resolve outstanding questions about how the fraud was accomplished and about the extent of the broker-dealer's knowledge concerning the fraudulent scheme.

8. This Eighth Application follows the same blueprint as the Seventh. Applicants have learned that the Respondent was involved in aggregating millions of the Warrants used to defraud the Otkritie Entities, and, through this Application, seek to know more about the Respondent's sourcing activities and relationship with the Co-Conspirators.

9. Unless otherwise stated, this Declaration is based upon my personal knowledge as obtained through communications with third-parties having direct knowledge, including U.K. counsel to the Otkritie Entities, and a review of documents produced in connection with the U.K. Action and related proceedings in the U.K and in other jurisdictions.

10. **Summary of U.S. Discovery Results:** In the U.K. Action, Applicants assert claims against Urumov, a former London-based OSL employee, Urumov's wife Yulia Balk, shell companies owned and controlled by Urumov, and other individuals and entities acting in concert with Urumov, including, among others, Pinaev, Kondratyuk, Jemai, and Vladimir Gersamia ("Gersamia") of Threadneedle Asset Management ("Threadneedle") for, *inter alia*, breach of fiduciary duty, breach of contract, deceit, conspiracy, accounting, tracing and restitution. In relevant part, Applicants allege that Urumov and his co-conspirators were the masterminds behind an approximately $160 million fraud on the Otkritie Entities involving Argentinean GDP warrants having the ISIN number ARARGE03E147 (hereinafter, "the Warrants Fraud").

3

11.     The assistance this Court has already provided pursuant to 28 U.S.C. § 1782 has been considerable. Subpoenas issued in connection with the Original, Second, Third, Fourth, and Sixth Applications yielded thousands of pages of documents with information relating the movement of funds in the wake of the Warrants Fraud.

12.     A color-coded chart attached hereto as "Exhibit 3" summarizes the achievements of previous discovery applications. Very briefly, disclosures resulting from the First and Second Applications, coded in green, identified and confirmed the movement of $150 million in Warrants Fraud proceeds through the accounts of Gemini Investment Fund Limited ("Gemini") at A.B. Bank Snoras ("Snoras"), a now insolvent Lithuanian bank, and Latvijas Krajbanka ("Krajbanka"), a now insolvent Latvian bank.

13.     The Third Application, represented in blue, traced the dissipation by co-conspirator Gersamia of $10.1 million in Warrants Fraud proceeds through various entities including Belux Company (Hong Kong) Limited, Templewood Capital Limited, Jaspen Capital Partners Limited, KD Shipping Co. Limited Inc., and Tremlett International Ltd.

14.     The Fourth Application, coded in red, traced the dissipation of Warrants Fraud proceeds from accounts held by a Ukrainian company, Donetsk Steel, Andriy Supranonok, the CEO of Jaspen and a suspected beneficiary of the Warrants Fraud, and a Tajikistan company called Silver LLC belonging to Jemai's father.

15.     The Fifth Application, coded in purple, yielded valuable information concerning the Co-Conspirators' efforts to broker a forward sale of the Warrants from Otkritie to Threadneedle with assistance from Newedge.

16.     With the Sixth Application, Applicants continued to trace the Warrants Fraud proceeds through the backwoods of the international banking system. As denoted in orange, the

Sixth Application focused on a comparatively smaller set of asset concealment transactions involving Krajbanka and Pireaus Bank, among others.

17. As noted above, the Seventh Application shifted gears. Over the repeated objections of Respondent BGC Financial, Inc. ("BGC"), Applicants sought and obtained documents and testimony concerning BGC's sourcing of the Warrants for the Co-Conspirators in the buildup to the Warrants Fraud. Although the subpoenas were served on BGC nearly six months ago, discovery relating to that application is still ongoing. Undersigned counsel will shortly continue the deposition of a BGC representative. The deposition will explore BGC's involvement in Warrant accumulation on behalf of the Co-Conspirators.

18. **Scope and Purpose of Eighth Application**: This Eighth Application, like the Seventh Application addressed to BGC, seeks information concerning the Co-Conspirators' sourcing and trading of the Argentinean GDP Warrants in a three-month period leading up to and including the time when the Warrants Fraud was undertaken.

19. A special U.K. discovery proceeding commenced against Royal Bank of Scotland plc ("RBS UK") earlier this year has revealed that RBS US, a Financial Industry Regulatory Authority ("FINRA")-registered broker-dealer and indirect wholly-owned subsidiary of RBS UK, provided RBS UK with at least 250 million of the Warrants sold to Co-Conspirators and used in the Warrants Fraud. *See* Second Witness Statement of James Allister Herring, dated May 23, 2013, at ¶ 6(g), a copy of which is attached hereto as "Exhibit 4"; Letter from Addleshaw Goddard LLP to Memery Crystal LLP, dated February 26, 2013, at ¶ 7, a copy of which is attached hereto as "Exhibit 32."

20. In essence, Applicants seek to obtain from RBS US all documents and information concerning its sourcing of the Warrants for RBS UK and instructions it received in connection therewith. Applicants believe that such information will further confirm the Co-

5

Conspirators' liability and might reveal still unknown aiders and abettors, including those entities or persons from whom RBS US obtained the Warrants later sold to the Co-Conspirators at fraudulently manipulated prices.

21. **The Otkritie Entities:** Otkritie Financial is the parent company of an international banking and finance group centered in Russia. *See* Particulars of Claim, dated November 18, 2011, ¶ 1.1, a copy is annexed hereto as "Exhibit 5." Otkritie Financial was established in 1995 and has grown rapidly. Today, Otkritie Financial is one of the leading banking institutions in Russia with over 240 branches.

22. Otkritie Management is a subsidiary of Otkritie Financial, incorporated in the British Virgin Islands. *See id.* ¶ 1.2.

23. Otkritie Management acts as an investment holding company and provider of finance to the Otkritie group of companies. *Id.*

24. OSL is a subsidiary of London-based Otkritie Financial, whose main areas of expertise are securities brokerage, portfolio management, financing and loans on securities, the issuing and cancellation of deposit securities, and the currency market. *Id.* ¶ 1.3.

25. **Georgy Urumov:** From February 2011 until he was suspended on September 8, 2011, Urumov was a trader in fixed income securities in OSL's London office. *See id.* ¶ 2. I am informed that he was formally terminated on December 22, 2011.

26. Urumov was recruited to OSL from Knight Capital Europe Group ("Knight") in October 2010, along with four members of Knight's fixed income team: Alessandro Gherzi ("Gherzi"), Nipun Ramaiya, Alicia Mujagic, and Jamil Mufti (collectively, the "Knight Traders"). *See* Second Affidavit of Howard Snell, dated December 7, 2011, ¶¶ 16-17, relevant excerpts of which are annexed collectively hereto as "Exhibit 6."

27.     Urumov came highly recommended to OSL's former Chief Executive Officer Roman Lokhov ("Lokhov") by two Otkritie employees: Ruslan Pinaev, an Otkritie trader in London and Moscow, and Sergey Kondratyuk, Otkritie's Head Fixed Income Trader in Moscow. *See* Second Witness Statement of Roman Lokhov, dated November 18, 2011, ¶¶ 40-41, relevant excerpts of which are annexed collectively hereto as "Exhibit 7."

28.     When Urumov joined OSL in February 2011, he was named manager of OSL's Fixed Income Group, making him a leader of OSL's agency trading business. *Id.* ¶¶ 35-40.

29.     **The Signing-On Fee:** In November of 2010, following a series of negotiations between Urumov and Lokhov regarding signing-on fees, OSL agreed to pay a multi-million dollar signing-on fee for Urumov and the other Knight Traders. *See* Ex. 6 ¶ 17. The signing-on fee payment was intended to be distributed in equal proportion among the five Knight Traders as part of their compensation package. *See id.* ¶ 18.

30.     Urumov misled OSL and distributed to his team members only a portion of the signing-on fee, keeping the balance for himself and two of his apparent cohorts, Kondratyuk and Pinaev. *See* Ex. 6 ¶ 19; Second Witness Statement of Howard Snell, ¶ 34, relevant excerpts of which are annexed collectively hereto as "Exhibit 8."

31.     Applicants believe the Co-Conspirators could have been planning this signing bonus fraud, and the Warrants Fraud which is the focus of this Application, for several months.

32.     **The First Argentinean Warrants Transaction:** After gaining employment at OSL, Urumov, working with Pinaev and others, orchestrated a sophisticated fraud on the Otkritie Entities, which resulted in an approximately $160 million loss. *See* Ex. 6 ¶¶ 6, 37-39. Before engineering this loss, Urumov, Pinaev and their co-conspirators engineered a small profitable transaction to ensure they could pull off the larger and more costly transaction. *Id.* ¶¶ 42-43.

33. On February 25, 2011, OSL entered into a trade involving the Warrants (hereinafter, the "First Argentinean Warrants Transaction"). *See id.* ¶ 42; Ex. 8 ¶ 52; *see also* Argentinean Warrant Offering Invitation, relevant excerpts of which are annexed collectively hereto as "Exhibit 9." The Warrants were first issued to the market between April 30, 2010 and June 7, 2010 as part of an offering coordinated by Deutsche, Barclays, and Citibank. *See id.* The Warrants that OSL traded in were Argentinean Peso-denominated and had the ISIN number ARARGE03E147. *See* Ex. 6 ¶ 42; Ex. 8 ¶ 52. But the Argentinean Warrants are also routinely traded in Euros and U.S. Dollars and have ISIN numbers XS0209139244, ARARGE03E154, or XS0501197262. *See* Ex. 9 at 13.

34. In the First Argentinean Warrants Transaction, the conspirators caused OSL to purchase 100 million Argentinean Warrants from Bulgarian-based Adamant Capital Partners AD ("Adamant") for $13.02 million. *See* Ex. 6 ¶¶ 43-44; Ex. 8 ¶¶ 53, 55.

35. OSL then re-sold the Argentinean Warrants a week later, on March 2, 2011, to Snoras, a Lithuanian financial institution controlled by Vladimir Antonov and recently taken over by the Lithuanian Central Bank. *See* Ex. 6 ¶ 41. *See* Bloomberg Article on Vladimir Antonov, dated December 15, 2011, a copy of which is annexed hereto as "Exhibit 10."

36. The sale was intermediated by JSC Norvik Banka ("Norvik"), a Latvian bank, at a price of $15.47 million. Ex. 6 ¶ 43; Ex. 8 ¶ 53. OSL earned a profit of approximately $2.45 million on the trade. Ex. 6 ¶ 43; Ex. 8 ¶ 53.

37. At or around the time the Argentinean Warrants were purchased, they were trading at approximately 13 Argentinean pesos (ARS) per 100. *See* Ex. 6 ¶ 38. The conversion rate between Argentinean pesos (ARS) and US dollars (USD) was about 4:1. *Id.*

38. In the trades that were processed—with OSL first on the buy-side and a week later on the sell-side—the exchange rate between U.S. dollars and Argentinean pesos was

8

expressed as 1:1 in OSL's Bloomberg trading system. Ex. 6 ¶ 46; Ex. 8 ¶¶ 56, 59. Upon information and belief, Urumov and/or Pinaev directed, or caused to be directed, Yevgueni Jemai to enter this incorrect exchange rate.

39. This first trade in Argentinean Warrants was a dry run for the subsequent fraud—specifically, a way for the co-conspirators to test an exchange rate tampering scheme and to create the perception of a robust market for the Argentinean security. See Ex. 6 ¶ 42.

40. **Second Argentinean Warrants Transaction**: On March 9, 2011, Urumov, Pinaev and their co-conspirators caused OSL to acquire 1.65 billion of the same Argentinean Warrants (hereinafter, the "Second Argentinean Warrants Transaction"). See Ex. 6 ¶ 37; Ex. 8 ¶ 47.

41. OSL paid approximately $213 million for the Warrants at a notional price of $12.9375 per 100. See Ex. 6 ¶ 37; Ex. 8 ¶ 47.

42. OSL purchased the Warrants from Adamant Capital Partners LP ("Adamant"), whom Applicants have confirmed was acting as a switch counterparty (*i.e.*, intermediary) between OSL and Snoras. See Ex. 6 ¶ 41; Ex. 8 ¶ 51; Adamant Capital Partners Securities Trade Confirmation, dated March 9, 2011, a copy of which is attached hereto as "Exhibit 11"; Bloomberg Trade Tickets for Trades in Argentinean Warrants between Adamant and Snoras, dated March 10, 2011, copies of which are attached hereto as "Exhibit 12."

43. At the time these Argentinean Warrants were purchased, they were trading at approximately 13 Argentinean pesos per 100. See Ex. 6 ¶ 37. The conversion rate between Argentinean pesos (ARS) and U.S. dollars (USD) was about 4:1. *Id.* ¶ 38.

44. When the Second Argentinean Warrants Transaction was processed, the exchange rate between US dollars and Argentinean pesos in OSL's Bloomberg trading system was, once again, expressed as 1:1, causing OSL to pay some $213 million for Warrants worth about $53

9

million, producing a loss of approximately $160 million. *See* Ex. 6 ¶¶ 38-39. We are advised that this $160 million loss figure is subject to revision based on evolving information concerning, *inter alia,* the precise ARS:USD exchange rate and market price for the Warrants at the time.

45. Senior management agreed to the transaction because Urumov assured them that it was riskless. *See* Ex. 6 ¶ 40; Ex. 8 ¶ 50. Urumov represented he had negotiated a forward sale of the Argentinean Warrants to a third party, Threadneedle, for approximately $228 million, with a maturity of six months, and that OSL would merely be acting as a temporary warehouse and provider of financing for the deal. *See* Ex. 6 ¶ 40; Ex. 8 ¶ 50.

46. Gersamia, then a portfolio manager at Threadneedle, played an essential part in the ruse, holding Threadneedle out as a willing counterparty. *See* Ex. 6 ¶ 40; First Affidavit of Neil Patrick Dooley, dated February 29, 2012, at ¶ 18, excerpts of which are annexed hereto as "Exhibit 13." Gersamia is a Georgian national, a business contact of Urumov, and close friend of Gherzi. *See* Ex. 13 ¶ 18.

47. The Threadneedle forward sale was never consummated and Threadneedle has insisted it never agreed to such a trade. Threadneedle later dismissed Gersamia for his role in the fraud. *See* Ex. 6 ¶¶ 40, 54; Ex. 8 ¶ 50.

48. Applicants believe Urumov and/or Pinaev again instructed Jemai to input the trade into OSL's Bloomberg trading system at the exchange rate of 1:1. *See* Ex. 6 ¶¶ 38-39. Urumov, however, claims to know "nothing whatsoever of the strategy behind the purchase [of the warrants] or whether Otkritie intended to warehouse the warrants." *See* Second Witness Statement of Georgy Urumov, dated November 4, 2011, at ¶ 106, relevant excerpts of which are annexed hereto as "Exhibit 14." Urumov insists he was absent having his thyroid removed during much of March 2011 when the Second Argentinean Warrants Transaction was being arranged. *Id.*

49. **RBS Involvement in the Accumulation of Warrants:** Applicants have discovered that at least 250 million of the 1.65 billion Warrants sold to OSL as part of the Warrants Fraud were acquired for the Co-Conspirators by RBS UK on or around March 14, 2011. *See* Witness Statement of Ryan John Lynch, dated March 1, 2013, at ¶¶ 19-20, a copy of which is attached hereto as "Exhibit 15." Dmitry Posokhov ("Posokhov"), the purchaser of the Warrants on behalf of the Co-Conspirators, was an employee of Snoras, which received $150 million in Warrant Fraud proceeds. *See supra* ¶ 13.

50. Upon information and belief, RBS UK employee Molly McKeown-Howell ("McKeown-Howell") was the Co-Conspirators' point person at RBS UK.

51. On February 18, 2011, Pinaev sent Ms. McKeown-Howell an email inquiring into the liquidity of "argy wrnt pessos." *See* Email exchange between R. Pinaev and M. McKeown-Howell, dated February 18, 2011, a copy of which is attached hereto as "Exhibit 17." McKeown-Howell answered that the Warrants are "surprisingly" liquid. *Id.* She elaborated that "[y]ou can do $5-10 mio without too much trouble." *Id.*

52. In the same conversation, Pinaev asked McKeown-Howell whether a trade of 500 million Warrants is "normal." *Id.* McKeown-Howell indicated that such volume was not uncommon "because these things trade in cents on the dollar." *Id.*

53. Emboldened, Pinaev asked McKeown-Howell whether she might be able to quote him prices for a "two way" transaction involving 1 billion Warrants. *See id.* ("Just for my understanding would you be able to quote for example 1bn two way? Or that's a big size for that market"). Upon information and belief, a "two way" transaction is one in which a broker acts as an intermediary or "switch" between two parties to a securities transaction who cannot trade directly with one another. McKeown-Howell equivocated, noting that her trader "would quote you that size if he knew your direction." *Id.*

11

54. Three minutes after speaking with Pinaev about the possibility of RBS UK's involvement in a large trade in the Warrants, McKeown-Howell sent Pinaev an RBS analysis of the "value" trading potential presented by Argentinean inflation-linked bonds like the Warrants. *See* Email from M. McKeown-Howell to R. Pinaev enclosing Trade Idea, dated February 18, 2011, a copy of which is attached hereto as "Exhibit 18."

55. On March 9, 2011, approximately three weeks later, RBS UK, through McKeown-Howell, agreed to sell to Posokhov and the rest of the Co-Conspirators some 250 million Warrants with settlement on March 14. *See* Ex. 15 at ¶¶ 19-20.

56. The Co-Conspirators purchased the 250 million Warrants from McKeown-Howell and RBS UK at a total cost of US$9.325 million. The transaction is reflected on a contemporaneous trade ticket. *See* Trade Ticket for Sale of 250 Million Warrants to Dmitry Posokhov, dated March 9, 2011, a copy of which is attached as "Exhibit 16." Payment for the transaction is reflected on a statement for a bank account then held by Co-Conspirators. *See* Gemini Investment Fund Ltd. Bank Statement for the period from Feb. 1, 2011 to Dec. 31, 2011, an excerpt of which is attached hereto as "Exhibit 39" (showing two debits from the Co-Conspirators' bank account totaling US$9.325 million on March 18, 2011).

57. We are advised that RBS UK has since terminated Ms. McKeown-Howell's employment.

58. Recent disclosures made by RBS UK in the context of a special discovery proceeding supporting the U.K. Action (hereinafter, the "RBS UK Proceeding") have revealed RBS UK sourced the Warrants it sold to the Co-Conspirators from the Respondent RBS US. *See* Ex. 4 at ¶ 6(g) ("RBS sourced the warrants from RBS Securities Inc, which is a separate legal entity and is based outside the jurisdiction."); Ex. 32 at ¶ 7(a) ("The warrants sold by our client – referred to in the trade ticket you provide – were acquired through RBS Securities Inc."

59. RBS US is a FINRA-registered broker-dealer regulated by the New York State Department of Financial Services. *See* RBS Securities Inc. FINRA Report, current as of Tuesday, May 28, 2013, a copy of which is attached hereto as "Exhibit 33"; Screenshot of Foreign Branches Regulated by the N.Y. Department of Financial Services, dated May 29, 2013, a copy of which is attached hereto as "Exhibit 34." RBS's website indicates that RBS US has offices at 101 Park Avenue, New York, New York 10178, but we understand that RBS US has recently relocated to 340 Madison Avenue, also in the District. *See* Screenshot of RBS Office Locations, dated May 29, 2013, a copy of which is attached hereto as "Exhibit 35."

60. Neither RBS UK nor RBS US is a party to the main U.K. Action.

61. We are advised that, despite numerous requests by Applicants' U.K. counsel, RBS UK has declined to make any further voluntary disclosures in the RBS UK Proceeding concerning RBS US's involvement in the Second Argentinean Warrants Transaction. We are also informed that, as a U.S. entity, RBS US cannot be compelled to provide information or disclosure by the courts in London.

62. **U.K. Action:** On October 5, 2011, after uncovering misappropriations by Urumov relating to the signing-on fee (*see* Ex. 6 ¶ 7), Otkritie applied for and obtained without notice to Urumov an *ex parte* freezing order and proprietary injunction against Urumov. *See* October 5 Freezing Order issued by HHJ Judge Mackie QC, a copy is annexed hereto as "Exhibit 19." The freezing order precluded Urumov from in any way disposing of, dealing with, or diminishing the value of the signing-on fee of $23 million paid by Otkritie to Urumov on November 22, 2010. *Id.*

63. On October 21, 2011, after further review of Otkritie's evidence and Urumov's defenses, Justice Burton confirmed and extended the October 5, 2011 asset freeze until further

order of the court. *See* Ex. 6 ¶ 9; October 21 Freezing Order issued by Justice Burton, a copy is annexed hereto as "Exhibit 20."

64. On December 7, 2011, the previous freezing orders were expanded by $160 million to incorporate suspected proceeds of the Warrants Fraud. *See* December 7 Freezing Order issued by Justice Burton, a copy is annexed hereto as "Exhibit 21."

65. On December 8, 2011, Applicants filed an amended "Claim Form," similar to a rudimentary complaint, refining their claims in the U.K. Action. A copy of the December 8, 2011 Claim Form is annexed hereto as "Exhibit 22."

66. We are advised by U.K. counsel that on March 1, 2012 the Applicants applied for the following orders later granted by Justice Flaux: (i) an order to join ten (10) additional defendants to the Action including, among others, Pinaev, Kondratyuk, and Yevgueni Jemai; (ii) an order to freeze the assets of the new defendants in various amounts between $2.5 and $160 million; and (iii) an order for judgment against one of the defendants, Dunant International SA ("Dunant") for $34 million. Copies of these orders are annexed hereto as "Exhibits 23 to 25."

67. On March 16, 2012, Justice Teare extended, until further order of the U.K. court or trial, the freezing order made by Justice Flaux.

68. In late March 2012, the Applicants became the registered owners of a property in England previously owned by Dunant and purchased for $32 million in April 2011 using monies misappropriated from the Applicants.

69. On May 10, 2012, the Applicants applied *ex parte* to add four additional defendants to the U.K. Action—the sisters of two previously named defendants and their offshore companies. Applicants also sought a freezing order covering the assets of the four additional defendants. Applicants' requests were granted by order of Justice Gloster dated May 10, 2012. *See* Order of Justice Gloster, dated May 10, 2012, a copy is annexed hereto as

"Exhibit 26." Ancillary to the application in the U.K. Action, Applicants have also taken steps to freeze a property in Spain acquired by one of the new U.K. defendants for approximately $6 million and to proceed against Pinaev in Israel. We are advised that these applications were granted as well.

70. On May 25, 2012, Justice Hamblen extended Justice Gloster's freezing order.

71. On June 14, 2012, the Applicants applied *ex parte* to add one additional defendant to the U.K. Action, the wife of Pinaev. Applicants also sought a freezing order covering her assets and permission to initiate proceedings against her in Israel. Applicants' requests were granted by order of Justice Cooke dated June 14, 2012. See Order of Justice Cooke, dated June 14, 2012, a copy is annexed hereto as "Exhibit 27."

72. On June 29, 2012, Justice Smith extended, until further order of the U.K. Court or trial, the freezing Order entered by Justice Cooke.

73. On July 16, 2012, Applicants applied for entry of a judgment of default against FO Firmly Oceans Corp., Natalia Demakova and Qast International S.A. Justice Teare entered default judgment against the three defendants for $36.8, $19.9 and $16.9 million, respectively. A copy of these orders is annexed hereto as "Exhibit 28."

74. On September 27, 2012, Applicants applied for entry of a judgment of default against Kondratyuk. Justice Field entered default judgment against the defendant for $183 million. A copy of this order is annexed hereto as "Exhibit 29."

75. On November 9, 2012, Applicants applied for default judgment against four defendants connected to the Jemai family—Yevgueni Jemai, Irina Jemai, Jecot, and Vantax Limited ("Vantax"). Default judgment was entered against Vantax, but denied or deferred as to the remaining three because, at the last minute, they entered appearances in the case.

76.     U.K. counsel has also advised that defenses have been served by a number of defendants in the U.K. Action, including Urumov and Pinaev. Urumov and Pinaev have denied any wrongdoing. In particular, they assert the instructions for Warrants Fraud trades came from Applicants' senior management; that the moneys received by Gemini were part of a commercial arrangement with Gemini; and that all dealings with Gemini were handled by Kondratyuk.

77.     On January 25, 2013, the Applicants entered into a settlement agreement with Kondratyuk. Pursuant to the settlement agreement, Kondratyuk agreed to repay the fraud proceeds he personally received and to cooperate with the Applicants in the U.K. proceedings. To date, Kondratyuk has repaid about $23 million of the $26 million or so that he received. Kondratyuk has also executed three witness statements confirming his participation in the fraud and explaining how it worked.

78.     On April 19, 2013, Kondratyuk was convicted of fraud and money laundering in Switzerland and sentenced to 3 years in jail. However, by that time, Kondratyuk had already spent 17 months in custody and was released for time served.

79.     Trial in the U.K. Action is scheduled to begin on Monday, June 17, 2013, and to last for 7 weeks.

80.     **RBS UK Proceeding:** On September 28, 2012, Howard Snell, OSL's CEO, wrote to Nic Fanucci at RBS UK requesting information concerning RBS UK's trading in the Warrants in or around March 2011. *See* Letter from H. Snell to N. Fanucci, dated Sept. 28, 2012, a copy of which is attached hereto as "Exhibit 36."

81.     Snell explained that it was OSL's understanding that Snoras had acquired approximately 250 million of the Warrants used in the Warrants Fraud from RBS UK on or around March 14, 2011. *Id.* Snell asked Fanucci to identify RBS UK's client in the purchase and sale of the Warrants and for other details relating to the trade. *Id.*

16

82. We are advised by Counsel for Applicants that RBS UK did not respond to this initial request for information.

83. On November 19, 2012, OSL solicitors wrote Mr. Fanucci for a second time requesting documents and information relating to RBS UK's trading in the Warrants during March 2011. *See* Letter from J. Jenkins to N. Fanucci, dated Nov. 19, 2012, a copy of which is attached hereto as "Exhibit 37." Counsel for OSL enclosed with its November 19 request letter a draft order itemizing its discovery demands. *Id.* Counsel indicated that if RBS UK did not agree to the discovery demands set forth in the proposed order by November 26, 2012, Counsel would file a discovery application with the U.K. courts. *Id.*

84. On December 14, 2012, Counsel for RBS UK replied to OSL's November 19 letter. *See* Letter from Addleshaw Goddard LLP to Memery Crystal LLP, dated December 14, 2012, a copy of which is attached hereto as "Exhibit 38." In relevant part, Counsel for RBS UK refused to acknowledge OSL's entitlement to the requested discovery under U.K. law. *Id.* RBS UK asked for the more information on the "precise basis" for OSL's request and how any discovery would be used. *Id.*

85. We are advised that between December 14, 2012 and March 1, 2013 RBS UK continued to resist OSL's request for documents and information concerning its trading in the Warrants in March 2011.

86. On March 1, 2013, OSL initiated the RBS UK Proceeding in the High Court of Justice, Queen's Bench Division, in London.

87. On May 23, 2013, in response to OSL's application for discovery, RBS UK's solicitor James Herring filed a Second Witness Statement. *See* Ex. 4. In that Second Witness Statement, Herring confirmed that RBS UK sourced the 250 million Warrants sold to Snoras from RBS US. *See id.* ¶ 6(g).

88. In the same witness statement, Herring acknowledged that RBS UK and RBS US were involved in an additional transaction in the Warrants during the period from January 1, 2011 to March 31, 2011 (hereinafter, "the Additional Warrants Transaction"). *Id.* ¶ 7. Herring elaborated that this Additional Warrants Transaction consisted of a "short term borrowing of warrants by RBS from another major bank which were then immediately lent onward by RBS to RBS Securities Inc." *Id.*

89. We are advised that RBS UK has agreed to provide another witness statement explaining the details of the Additional Warrants Transaction, but that it will not offer any insight into RBS US's involvement, client instructions, or objectives. We are also advised that RBS UK has acquiesced to OSL's demands for full details of the trades in the Warrants involving RBS UK during the relevant period. But we are told OSL's understanding of the Warrant trading in and around March 2011 will be incomplete without a deeper understanding of RBS US's (and its clients') involvement.

90. We are further advised that U.K. solicitors cannot issue demands against the Respondent because it is not subject to the U.K. court's jurisdiction. As a result, any efforts to obtain discovery would need to be processed pursuant to the Hague Convention; would take many months, providing Urumov and his co-conspirators more time to dissipate the diverted funds; and would be unlikely to provide the same level of response as this Application.

91. In addition, U.K. counsel advises us that there would be no restrictions under U.K. law on Applicants' use of any discovery obtained through this Application in connection with any judicial proceedings relating to the U.K. Action.

92. Finally, we are advised that Applicants will be able to make appropriate use of any discovery obtained through this Application in the U.K. Action even though trial in the U.K.

Action is fast-approaching and it may take some time for the Respondent to comply with Applicants' requests.

93. **Other Proceedings:** Both the signing-on fee misappropriation described above and the Argentinean Warrants Fraud have been reported to the U.K. Financial Services Authority and the City of London Police. *See* Ex. 6 ¶ 8. Criminal investigations are ongoing in England, and have the Otkritie Entities' full cooperation. Urumov, his wife Yulia Balk, Gersamia, Jemai, and Gherzi have been arrested by City of London Police and released on bail after questioning.

94. As part of its ongoing investigation into the Warrants Fraud, Otkritie has also directed a criminal complaint against the co-conspirators to Swiss authorities. *See id.* ¶ 10.

95. We are advised that, in April 2012, the Geneva Public Prosecutor indicted Yevgueni Jemai's mother, Olessia Jemai, on charges of money laundering, involving proceeds of the frauds at issue in the U.K. Action. We are further advised that Jemai has now also been charged with fraud and money laundering in Switzerland.

96. In addition, we are advised that the Geneva Public Prosecutor has frozen nearly $50 million in cash assets and property assets worth in excess of $17 million. *See id.* ¶ 15.

97. Applicants have commenced related proceedings in jurisdictions such as Hong Kong, Gibraltar, Luxembourg, Israel, and the Bahamas. *See* Third Witness Statement of Neil Dooley, dated December 14, 2011, at ¶¶ 13-21, excerpts of which are annexed hereto as "Exhibit 30."

98. **Notice:** Contemporaneous with the filing of this Seventh Application, Applicants are providing copies of these papers to the General Counsel's office of RBS US.

99. **Dissipation of Misappropriated Funds and Dilatory Tactics:** Applicants do not believe that Urumov, Pinaev, Jemai, or their cohorts need to be provided with notice of these proceedings because they have expressly disavowed any knowledge of, or involvement in, the

Second Argentinean Warrants Transaction to which this Application is addressed. *See* Ex. 7 ¶ 106.

100. Furthermore, Applicants oppose giving notice of these proceedings to Urumov, Pinaev, Jemai, or their co-conspirators because Applicants believe, based upon recent experience, that they may seek to interfere with these proceedings and attempt to further conceal misappropriated funds. *See, e.g.,* Ex. 6 ¶¶ 113-15.

101. In the U.K. Action, when ordered by the court to disclose the full extent of his assets, Urumov failed to identify several companies he owned or otherwise controlled, including Dunant, which was later discovered to have transferred funds in breach of the U.K. court's October 5 Freezing Order. *Id.* ¶¶ 110-11. Moreover, Urumov, failed to disclose that he and his wife had acquired a property in the U.K., in Dunant's name, for $32 million. *See id.* ¶¶ 105-06.

102. Furthermore, on September 27, 2012, Justice Field ordered that Pinaev and his wife must submit to cross-examination regarding their assets because he was not satisfied that they had complied with their asset disclosure obligations. *See* Order of Justice Field, dated September 27, 2012, a copy of which is attached hereto at "Exhibit 31."

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
June 11, 2013

_____
Michael C. Miller